Cabüthebs, J.,
delivered the opinion of the court.
James H. Watt made his will on the 20th day of December, 1852, appointing the defendant executor, who *580 was qualified as such at the January Term of Madison county court, 1853. In the said will- this clause is contained: £í I direct that all my slaves he set free, and be sent to a Free State, at my expense, as soon as possible.”
The said slaves are Charlotte and her children, Frances, Martha, and Ellen. They filed their bill by Sami. Lancaster their next friend, in the chancery court of Madison, to assert their rights under said will. The executor is charged with a breach of trust in not carrying out the provisions of the will in their behalf, but instead, thereof, filing a petition to sell them for distribution, which is enjoined in this suit.
The court below decreed that they should be set free, and sent to Liberia, from which the defendant appealed to this court.
It is insisted here, that the bequest of freedom was conditional; that it was only to take effect if they could be sent to a Free State of this Union, and as that cannot be lawfully done, the bequest fails, and they remain in slavery, and must be distributed by the executor. Such it is argued was the intention of the testator, and this intent must prevail; that by the term “ Free State,” he could not have meant Liberia, or any other foreign country. They cannot be sent to a Free State of this Union, it is contended, because of their prohibitory laws, or a rule of general comity, forbidding that one community should cast off its refuse population upon another.
1. What was the intention of the testator? Il.e certainly very clearly expresses' an intent, that his slaves should be free. But further, he intended that they *581 should be sent to a Eree State, at his expense. If it be conceded that he meant one of the non-slaveholding States of this Union, as he most probably did, and that they cannot be sent there, it does not follow that the right to freedom fails, and the state of bondage must continue. To take it in the strongest point of view, a case of conflicting intention is presented; the one practicable and lawful, and the other impracticable and unlawful ; the one primary, the other secondary. It cannot be doubted but that his main object and purpose was to secure the freedom of his slaves, and that, as he expresses himself, “as soon as possible.” He knew that they could not remain in this State, and therefore provided, that at the expense of his estate, they should be sent to a place where they could lawfully remain. It cannot be for a moment believed, that the particular place, to which they were to go, was a very prominent matter in his mind. If that had been so, he would, as is often done, have made it a condition, and provided for its failure, by making some other disposition of them. He certainly did not intend in any event to die intestate as to his slaves. But as a question of construction, a broader meaning could well be given to the words “ Eree State.”
It is a well settled principle, that in the construction of wills containing inconsistent clauses, the primary provisions shall prevail against the secondary. Lewis et als. vs. Daniel administrator, 10 Humph., 314. In this case on account of the strong desire of the testator, evinced by frequent repetitions in his will, for the emancipation of his slaves, this intention was made to prevail over an express condition, that if they could not under the laws *582 remain in the State, they should go to a named legatee. This was done, under the force of the- principle above stated, in relation to conflicting intentions. This was certainly a very strong case, and can only stand upon its own circumstances. Judge Turley giving the opinion of the court remarks, “ we have heretofore held that a devise of freedom is a substantive thing, whether it he recognized by the State or not'; and that ho one but the State can interfere in relation thereto. TTpon what principle then, can this executor, or the devisee, object to this emancipation, unless it be, that the emancipation cannot he effected according to law? The slaves have acquired a right to their freedom inchoate, and they have a right to ask the protection of the law therefor, as far as it is given; they are not to he estopped by the fact that the devisor in a different clause of his will, has devised them to his executors,' if they cannot he emancipated so as to remain in the State. If they chose to go out of it, what right has the executor or devisee to complain? None in our estimation whatever.”
In the case of Laura Jane vs. Hagen adm’r., 10 Humph., 332, this court again held, (Judge Geeex, delivering the opinion,) that it has been “uniformly held that a bequest of freedom, discharged the person so emancipated from all obligation of services to the legatees or distributees of the testator, or his personal representatives, though the assent of the State may not have been obtained.” The same principle is laid down and discussed in the case of Lewis vs. Simonton, 8 Humph., 188, by one of the present members of this court.
So whatever we might think of this doctrine, if it were an- open question, it is now too firmly fixed by a *583 uniform series of decisions, to "be disturbed. It is true that it seems to recognize a kind of intermediate state, between freedom and slavery, which it is difficult to manage and regulate. The legislature in 1851-2, ch. 300, attempted a remedy by providing for the appointment of trustees, by the county court, to’ control such nondescript members of the community, by hiring them out, paying over the proceeds of their labor to them, and to be subject to all the responsibilities of master. But the operation of this act was postponed for two years; before which time it was repealed by the legislature which has just adjourned. It was certainly in contravention of the present settled policy of the State, as established by the act of 1831, ch. 102, revised by the act of 1849, ch.' — ., which is, that emancipation shall depend upon immediate removal from the State.
But by the act of last session, these difficulties are mostly removed, and our laws made consistent and sensible on this subject. The struggle has been to '¿Évise some plan which would be just • to the slave, and not inconsistent with the interests of society, that would sustain his right to liberty, and at the same time save the community from the evils of a free negro population.
This it is believed, has been more effectually accomplished by the late act, than at any time before. It provides: “That hereafter all slaves in this State acquiring a right to freedom, whether by contract or will, shall be transported to the western coast of Africa. If the slaves be liberated by will it shall be the duty of the executor or administrator, if by contract, the duty of any justice of the peace, sheriff, clerk, constable, or register, who may have any knowledge of the facts, to *584 file a petition in tike circuit court of the county in which such slave resides, setting forth the facts;” copies shall be served on the slave, and former owner, &e. If a fund sufficient for transportation, and six months’ support has been provided, it shall he paid into court, and if not sufficient, it shall be raised by hiring out the slaves. "When the fund is sufficient, it is made the duty of the . judge to notify the governor, and order the money to be paid- to the treasurer of the State, subject to the check of the governor, who shall attend to their transportation, &c. The provisions of this act are made to apply to any court in which a suit for freedom may be brought, as well as the circuit court. It also extends to “all slaves which have heretofore acquired a right to freedom, but which have not been emancipated by the county court.”
As this act expressly applies to the case before us, and only relates to the terms and conditions on which the fensent of the State shall be given5 and does not effect any existing right of others, we think this, and all other cases not disposed of by the courts, must fall under its provisions. "We regard this as the most wise and judicious plan, which has been yet devised, and with some amendments, it should become the settled policy of the State. It will be seen that this act provides ample means for the court to force the funds, provided for the purpose, into court.
This act was doubtless intended to supercede all others, as to the terms upon which the assent of the State should be given, to the emancipation of slaves, and establishes a uniform mode of proceeding, taking from the owners and the courts, all discretion on the *585 subject. They must be sent to the western coast of Africa; there is no alternative.
The chancery court has full and perfect jurisdiction in this case, and to that we remand the cause, to be proceeded in under the provisions of the act, to which reference has been made.
There is, however, another question in this case, which it may be proper now to decide. In addition to the legacy of freedom to these slaves, which we have seen is a distinct and substantive thing, the testator bequeaths for their benefit a sufficiency of his estate, to bear their expenses to a Free State, and as they cannot go to a Free State of this Union, which as we have said, was doubtless- in his contemplation, but must be sent to Liberia, under the present state of the law, can the estate be taxed with the very large additional amount that would be necessary for the purpose? The decree of his honor, the chancellor, we think, in this respect, is erroneous. He 'not only threw upon the estate the expenses of sending them to Liberia, but required that an amount sufficient should be raised in that way, to keep them there six months. This we think, was not the intention of the testator; and so far as this legacy to, or for the benefit of the slaves is concerned, it must fail, with the secondary object of the will, that the slaves should go to a Free State of this Union. Although we think that this change in the policy of the State, as to the destination of emancipated slaves, as a condition upon which the consent of the State is given, cannot effect their claim to freedom; for according to the decisions to which we have referred, settling the law on this subject, no one had any right to them after the probate *586 of the will, nor conl'd any one but the State, question their perfect l'ight to liberty, yet their right to the further legacy of their expenses, depends upon other considerations and principles. Others have an interest in the estate, which cannot be affected by any subsequent enactment of the legislature. The fund necessary to send them to Liberia cannot be raised out of the estate, but must be created by hiring said slaves, or derived from other sources under the direction of the chancery court.
Totten, J., dissented.